26-MJ-6692-MPK

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Special Agent Peter Kelley, being sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since September of 2005. I was previously assigned to the Baltimore III Field Office (2005-2011), the Boston II Field Office (2011-2021), the ATF Special Response Team (2021-2026), and have been reassigned to the Boston II Field Office since June of 2026. My responsibilities include the investigation of possible violations of federal law, including felons in possession of firearms, carrying a firearm in furtherance of drug trafficking, dealing firearms without a license, and firearms trafficking. During my tenure with ATF, I have initiated and participated in multiple investigations related to the illegal use, possession, and trafficking of firearms, and the illegal use, possession, and distribution of controlled substances. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2. I submit this affidavit in support of a criminal complaint charging Joseph KING ("KING") (YOB 1977) with possession with intent to distribute a controlled substance, on or about August 11, 2026, in violation of Title 21, United States Code, Section 841(a)(1).

3. This affidavit is submitted for the limited purpose of establishing probable cause to secure a criminal complaint. In submitting this affidavit, I have not included each and every fact known to me and other law enforcement officers concerning this investigation. Instead, it only contains facts sufficient to establish probable cause in support of a criminal complaint.

## PROBABLE CAUSE

4. Since June 2026, the ATF Boston Violent Crime Joint Strike Force (also known as

Boston II) has been engaged in an investigation into the suspected drug distribution activity of a Quincy-based individual, Joseph KING.[1]

6. As part of this investigation, on three occasions in June and July 2026, an ATF undercover agent (the "UC") made purchases of narcotics (suspected cocaine) from KING. These transactions are described below. The UC is an experienced ATF agent who has experience with guns and drugs including cocaine, fentanyl, heroin, and drugs in pill form. The following information was provided to me by law enforcement officers participating in this investigation, the UC's reports pertaining to this investigation, as well as the UC's in-person and telephonic communications with the targets of the investigation.

### June 24, 2026 UC Purchase of Cocaine from Joseph KING

6. Specifically, on June 24, 2026, through a series of text messages exchanged with KING, KING and the UC arranged to meet to complete a planned sale of cocaine. KING directed the UC to an address in Braintree, MA and when the UC arrived, KING entered the front passenger side of the UC's vehicle.

7. During the transaction, KING opened a black backpack in his possession and removed a clear plastic bag containing two white block-like substances that, based on the UC's training and experience, were recognized to be cocaine. The UC also noted the number "150" written in black marker on the clear plastic bag. The UC took possession of the suspected cocaine and proceeded to weigh it on a digital scale. The UC then paid KING $2,900.00 in government funds.

---

[1] KING has several prior convictions to include a 2025 conviction for breaking and entering in Taunton District Court (Docket No. 2231CR002998) and a 2009 conviction for larceny in Quincy District Court (Docket No. 0856CR006280), among other convictions.

2

8.      During this transaction, KING discussed the prices for various larger quantities of cocaine that KING could sell the UC and advised that a kilogram quantity of cocaine would cost "18.5," which the UC understood to mean $18,500.00.  KING also advised the UC that he needed "hammers," which the UC understood, based on commonly used street vernacular, to mean firearms.  Following this transaction, the suspected cocaine, packaging included, was weighed and field tested by investigators, yielding a gross weight of approximately 158 grams and presumptive positive results for the presence of cocaine.

*June 30, 2026 UC Purchase of Cocaine from Joseph KING*

9.      On June 30, 2026, through a series of text messages and telephone calls with KING, KING instructed the UC to meet him in Quincy, MA to make another purchase of cocaine.  The UC was accompanied by a second undercover agent ("UC 2") for this transaction.  When the UCs arrived at the listed address, KING invited the UC and UC 2 inside the residence.  While the UC, UC 2, KING, and a fourth individual were inside the residence, the UC observed KING open a black backpack and retrieve a clear plastic bag containing two block-like white substances that, based upon the UC's training and experience, they recognized to be cocaine.  The UC also observed that the clear plastic bag was marked with the number "150" in black marker.  The UC noted that the packaging was similar to that used in the prior controlled purchase from KING.  The UC provided KING with $2,900.00 in government funds in exchange for the suspected cocaine.

10.     Following this transaction, the suspected cocaine, packaging included, was weighed and field tested by investigators, yielding a gross weight of approximately 154 grams and presumptive positive results for the presence of cocaine.

*July 28, 2026 UC Purchase of Cocaine from Joseph KING*

11.     On July 28, 2026, through a series of telephone calls and text messages between the UC and KING, the UC arranged to purchase another 150 grams of cocaine from KING.  KING

3

and the UC met at an address in Boston, MA. At the location, KING provided the UC with a clear plastic bag containing what the UC recognized as cocaine in exchange for $3,160.00 in government funds.

12. During the transaction, the UC and KING discussed the UC purchasing a kilogram quantity during the next purchase. KING confirmed he could do that but needed 24 hours and indicated that he needed to talk with his supplier.

13. Following this transaction, the suspected cocaine, packaging included, was weighed and field tested by investigators, yielding a gross weight of approximately 163 grams and presumptive positive results for the presence of cocaine.

### August 11, 2026 UC Purchase of Cocaine from Joseph King

14. On the evening of July 28, 2026, KING sent the UC a voice message via WhatsApp explaining that he was going to meet with his supplier, and that, once they were together, they would call the UC. Later that evening, the UC spoke with KING and his supplier. Also on the call was another UC who was a Spanish-speaking undercover ATF agent (hereinafter "UC 3"). UC 3 translated for KING's supplier who spoke Spanish. UC 3 is an experienced ATF agent who has experience with guns and drugs including cocaine, fentanyl, and heroin, and drugs in pill form.

15. During the call, KING, KING's supplier, the UC, and UC 3 discussed the UC's interest in purchasing one kilogram quantity of cocaine, the price of said cocaine, and when KING and KING's supplier could have it available for purchase. UC 3 stated that they would have the funds for the purchase of one kilogram available the following week.

16. KING's supplier said he was going to acquire one kilogram for the UC, and that he would notify KING once the kilogram was available. The UC told KING that the UC would go through him to facilitate the transaction, which KING acknowledged. The UC advised KING that

4

he would contact him over the upcoming weekend to confirm that all arrangements remained in place for the anticipated transaction the following week. The conversation ended shortly thereafter.

17. Through texts and phone calls between July 28, 2026 and August 5, 2026, the UC continued to coordinate the purchase of one kilogram of cocaine with KING to take place on August 6, 2026. On August 4, 2026, the UC also asked KING if he was still interested in buying firearms per the UC and KING's June 24, 2026 conversation about "hammers." KING initially indicated that he needed to "think on that" and needed to make sure that he had cash available. The UC and KING continued to discuss the types of firearms the UC could sell KING. KING told the UC that the sale of the firearms would not reduce the price of the kilogram of cocaine but that he would have "a little extra anyway" to put towards the purchase of the guns.

18. The cocaine and firearms transactions did not end up taking place on August 6, 2026. The UC and KING continued to communicate through text messages and phone conversations, and the UC arranged a second date, August 11, 2026, to meet.

19. On August 11, 2026, at approximately 3:25pm, law enforcement observed KING park his vehicle and enter a residence in Dorchester, MA carrying a black backpack. Less than ten minutes later, law enforcement observed KING exit the residence still carrying a black backpack. At approximately the same time, the UC received a message from KING via WhatsApp asking for the address of their meeting location. The UC provided the address of a hotel in Boston, MA.

20. At approximately 4:04pm, KING arrived in the vicinity of the designated hotel in Boston, MA. About 20 minutes later, after a series of phone calls and texts messages with the UC related to the UC's location, KING arrived at the UC's hotel room. The UC and UC 2 were waiting for KING inside.

5

21.     KING retrieved a vacuum-sealed clear plastic bag from his backpack containing what the UC and UC 2, based on their training and experience, recognized as cocaine.  The words "exact," "1000," and "100x100" were written on the clear plastic bag in black marker.  The UC utilized a digital scale to weigh the suspected cocaine which yielded a gross weight, packaging included, of approximately 1,017 grams.

22.     At this time, UC 2 retrieved a paper bag containing two firearms – a Glock 19M, 9mm pistol bearing serial number ADDM109 and a Glock 27, .40 caliber pistol bearing serial number TMU995.  As described above, KING and the UC had previously discussed KING's interest in purchasing firearms.  The UC brought these firearms to the transaction for KING.  KING purchased the firearms separate and apart from the UC's purchase of suspected cocaine.  KING handled and inspected one of the firearms and expressed his interest in purchasing both firearms on behalf of another individual but did not provide a name.  The UC and UC 2 and KING negotiated a purchase price of $1,000.00 for both firearms.  KING provided UC 2 with $1,000.00 in exchange for the firearms.  The UC then provided KING with a portion of government funds needed to purchase the one kilogram of suspected cocaine.

23.     Immediately following the sale of the firearms and suspected cocaine, ATF agents detained KING.  KING was advised of his *Miranda* rights, which he waived and agreed to speak with agents.  The interview was recorded; the account that follows is summary in nature.  KING advised that he obtained the one kilogram of cocaine from his supplier, a person he identified by first name.  Prior to the transaction, KING had traveled to a residence in Dorchester, where he met with his supplier and obtained the cocaine.

24.     I showed KING a photograph from the Massachusetts Registry of Motor Vehicles, devoid of identifying information, of Person 1, whose identity including name and date of birth is

known to me.  KING identified this individual as his supplier.  KING further advised that his supplier maintains a residence in Dorchester, MA where he stores cocaine.  I showed KING a photograph of the residence where he was observed entering earlier that day and King confirmed that this residence was the location where he met his supplier prior to the transaction to obtain the cocaine.

25.    Following the transaction, the suspected cocaine was field tested by investigators, yielding a presumptive positive result for the presence of cocaine.

26.    Based on my training and experience and the information above, including the fact that KING sold the UC cocaine on three different occasions in June and July 2026, and that pursuant to communications between KING and the UC between July 28, 2026 and August 11, 2026, in which the UC confirmed his intent to buy one kilogram of cocaine, KING arrived at the designated hotel in Boston, MA on August 11, 2026 with the one kilogram quantity in his possession, there is probable cause to believe that KING distributed and possessed with intent to distribute these narcotics.

*(Space Intentionally Left Blank)*

26-MJ-6692-MPK

## CONCLUSION

27.     Based on all of the foregoing, I submit that there is probable cause to believe that on or about August 11, 2026, KING did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).



Respectfully submitted,

/s/ Peter Kelley

Peter Kelley, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF)

Sworn to me via telephone in accordance with Fed. R. Crim. P. 4.1 on August 12, 2026:

HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

8